The Full Commission has reviewed the prior Decision and Order based upon the entire record of the proceedings before Deputy Commissioner George T. Glenn, II and the briefs and arguments on appeal. Based upon the assignments of error, the appealing party has shown good ground to reconsider the evidence. This case involves the tragic killing of a young man, as the unexpected and extremely unfortunate result of what appears to have been a questionable stop for speeding five miles over the speed limit. The Full Commission recognizes that numerous inconsistencies exist in the testimony of the witnesses. However, it was plaintiffs' burden to prove negligence on the part of defendant's agent Trooper Stephenson. Having considered the voluminous evidence in this record, the Full Commission finds that plaintiffs failed to sustain their burden of proof and REVERSES the Deputy Commissioner's holding and enters the following Decision and Order.
 * * * * * * * * * * * EVIDENTIARY AND PROCEDURAL RULINGS
_____The objections raised by defendant as to numerous evidentiary and procedural rulings made by the Deputy Commissioner are ruled upon in accordance with the applicable provisions of the law and the Decision and Order in this case.
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, as:
 STIPULATIONS
1. All the parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Tort Claims Act.
2. Norwood F. Fennell and Annie B. Fennell are the duly designated administrators of the estate of their late son, Kenneth B. Fennell.
3. On 30 August 1993, Trooper Richard L. Stephenson shot and killed Kenneth B. Fennell.
4. The issues to be determined by the Full Commission are as follows:
 a) Whether Trooper Richard L. Stephenson was negligent in the shooting of Kenneth B. Fennell?
 b) If so, what, if any, damages are plaintiffs entitled to recover?
 * * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. On 30 August 1993, at approximately 7:05 p.m., Trooper Richard L. Stephenson (hereafter Trooper Stephenson) was on duty on Interstate 85 (hereafter I-85) in Randolph County, North Carolina, near the Guilford County line. On that date, Trooper Stephenson was employed by the North Carolina State Highway Patrol and had been so employed since 11 January 1986.
2. On the date in question, Trooper Stephenson was conducting radar surveillance of vehicular traffic traveling northbound on I-85. His patrol car was stationary in the median beneath the Highway 311 bridge.
3. Trooper Stephenson observed a blue Pontiac Grand Am headed northbound on I-85, and estimated the car was traveling at seventy (70) miles per hour. The speed limit on this portion of I-85 was sixty-five (65) miles per hour. Using his radar, Trooper Stephenson clocked the vehicle which was in fact traveling seventy (70) miles per hour. After verifying the speed of the car, Trooper Stephenson pulled out from his position with the intent to stop the vehicle and to give the driver a warning ticket.
4. Trooper Stephenson caught up with the vehicle and activated his blue light. The vehicle pulled over onto the right shoulder of I-85 and stopped. The motorist exited his vehicle and began walking toward Trooper Stephenson's patrol car before Trooper Stephenson was able to position his car. Trooper Stephenson exited his vehicle and walked up to the motorist, who was an African-American male estimated to be between twenty (20) and thirty (30) years old. The motorist asked why he had been stopped, and Trooper Stephenson indicated he had been stopped for speeding.
5. Trooper Stephenson then asked the motorist to sit in the right front passenger seat of his patrol car. The motorist complied with Trooper Stephenson's request and sat in the patrol car with Trooper Stephenson.
6. Trooper Stephenson asked the motorist for his operator's license and the motorist produced a student ID indicating that his name was Kenneth B. Fennell (hereafter Mr. Fennell). Trooper Stephenson again asked Mr. Fennell for his license, and Mr. Fennell told him that he had a New York operating license and gave it to Trooper Stephenson. Next, Trooper Stephenson contacted dispatch to determine if Mr. Fennell had a valid North Carolina or New York operator's license. Trooper Stephenson was advised that Mr. Fennell did not have a valid North Carolina operator's license and that the information was inconclusive at that time as to whether he had a valid New York license.
7. The vehicle Mr. Fennell was driving was a rental car. When Trooper Stephenson asked how the vehicle had been rented, Mr. Fennell informed Trooper Stephenson that his girlfriend had rented the car and presented the rental agreement.
8. Trooper Stephenson issued Mr. Fennell a citation for not having a valid operator's license. Thereafter, Trooper Stephenson asked Mr. Fennell if he had any illegal drugs, contraband, or weapons in the vehicle. Mr. Fennell said that he did not. Trooper Stephenson then asked if he could search the vehicle and Mr. Fennell verbally consented to the search. Trooper Stephenson had written consent forms in his patrol car that he normally asks motorists to sign, but he did not secure a written consent prior to this search.
9. Before beginning the search, Trooper Stephenson asked Mr. Fennell to pull his car farther off the right side of the highway because the car was too close to the traveled portion of the road. Mr. Fennell pulled his vehicle farther off the right side of the highway and as he left the vehicle, Mr. Fennell opened the trunk.
10. Trooper Stephenson determined that there was no reason to search the trunk and proceeded to search the passenger compartment of the vehicle. Trooper Stephenson first attempted to search the glove compartment, but could not open it. Mr. Fennell then opened the glove compartment. Trooper Stephenson asked Mr. Fennell to stand next to the front right side of the rental car. Next, Trooper Stephenson looked through some items that were on the front seat.
11. Trooper Stephenson then placed his left hand under the front passenger side seat and removed a black bag from under the front seat and began to unzip it. When he had the bag approximately half open, Trooper Stephenson saw the barrel of a gun.
12. When Trooper Stephenson asked Mr. Fennell about the gun, the credible evidence of record indicates that a physical altercation began and that Mr. Fennell struck Trooper Stephenson between the eyes. When Trooper Stephenson was hit, he dropped the black bag and he and Mr. Fennell began to struggle.
13. At some point during the struggle, Trooper Stephenson pulled his convoy and swung it at Mr. Fennell. The convoy did not strike Mr. Fennell and either fell from Trooper Stephenson's hand or was knocked out of his hand. Next, Trooper Stephenson pulled out his mace, but it also was either dropped or knocked out of his hand.
14. Trooper Stephenson then grabbed Mr. Fennell and threw him onto the ground. Trooper Stephenson attempted to gain control of Mr. Fennell by pushing down on Mr. Fennell's throat with his right arm while attempting to maneuver so that Mr. Fennell could not reach Trooper Stephenson's service revolver. However, Trooper Stephenson could feel Mr. Fennell's hand going up and down his back in what he believed to be an attempt to reach Trooper Stephenson's service revolver. When Trooper Stephenson realized he was not going to gain control of Mr. Fennell, he released Mr. Fennell and stood upright.
15. After the two men separated, Mr. Fennell ran to and picked up the black bag and began to unzip it. Trooper Stephenson removed his service revolver when Mr. Fennell picked up the bag and told Mr. Fennell that if Mr. Fennell continued to attempt to get the gun, Trooper Stephenson would shoot him. Despite this warning, Mr. Fennell continued to attempt to remove the gun from the bag.
16. When Trooper Stephenson saw the butt of the gun coming out of the bag in Mr. Fennell's hand, he fired once at Mr. Fennell. Trooper Stephenson did not know at that time whether he had hit Fennell with this first shot. After the first shot, Trooper Stephenson waited to determine what Mr. Fennell was doing. When Trooper Stephenson discovered that Mr. Fennell was still attempting to gain control of the gun, he again told Mr. Fennell not to remove the gun. After determining that Mr. Fennell was continuing to remove the gun from the bag, Trooper Stephenson fired a second shot at Mr. Fennell. After the second shot, Mr. Fennell continued removing the gun with his right hand. When Mr. Fennell cleared the gun from the bag and positioned it in Trooper Stephenson's direction, Trooper Stephenson fired the third and fourth shots in rapid succession. These shots caused Mr. Fennell to spin to his right, where he fell with his face to the ground. Additionally, after these final two shots, Mr. Fennell's gun flew from his hand. A gun was found later approximately twelve feet from the location of Mr. Fennell's body.
17. Trooper Stephenson stated that he was continually backing away from Mr. Fennell from the time the two men were separated so that he was twenty to twenty-five (20-25) feet from Mr. Fennell when the first shot was fired. However, the evidence is inconclusive as to the exact position of Mr. Fennell during the period in which shots were fired.
18. On 30 August 1993, Ms. Vicki L. Turner was traveling in a northerly direction on I-85 in a car being operated by Mr. Willis Ray Jones. Ms. Turner's attention was first drawn to the scene by the blue flashing lights of the trooper's patrol car. Ms. Turner then saw Trooper Stephenson and Mr. Fennell pushing and shoving each other. Next, Ms. Turner observed Trooper Stephenson stepping back and Mr. Fennell hitting Trooper Stephenson in the head. As her vehicle moved past the scene, Ms. Turner saw Trooper Stephenson and Mr. Fennell fighting on the ground. While her car was stopping, Ms. Turner lost sight of Trooper Stephenson and Mr. Fennell, but she heard a gunshot. As she turned back towards the scene, Ms. Turner saw Trooper Stephenson standing at the front left corner of the rental car with his gun drawn and pointed at Mr. Fennell. Ms. Turner then heard two more gunshots and saw Mr. Fennell raise his arms to his chest and fall backwards. In her statement, Ms. Turner did not report seeing a gun in Mr. Fennell's hands.
19. On 30 August 1993, Mr. John William Lovings, Jr., also witnessed events at the scene in question. On that date, Mr. Lovings was traveling south on I-85, in the opposite direction from the vehicles driven by Trooper Stephenson and Mr. Fennell. As he approached the scene, Mr. Lovings first noticed the blue flashing lights of the patrol car. Upon moving closer, Mr. Lovings observed Mr. Fennell "creeping" around the back of the rental car, then running up beside the car towards Trooper Stephenson. Mr. Lovings then lost sight of the men momentarily as he stopped his vehicle. While he then ran towards the scene, Mr. Lovings observed Mr. Fennell hitting Trooper Stephenson, who was attempting to block the blows. Having crossed the median, Mr. Lovings looked up the interstate to determine if he could cross to the other side. When he looked back at the scene, Mr. Lovings observed Trooper Stephenson shouting at Mr. Fennell with his weapon drawn. At this point, according to Mr. Lovings, Mr. Fennell was partially down an embankment with his arms pointing in the direction of Trooper Stephenson. However, Mr. Lovings could not see Mr. Fennell's hands and consequently, could not detect whether or not Mr. Fennell had a gun. Mr. Lovings heard the initial shot, then after a pause, three more shots. Mr. Lovings did not see anything fly from Mr. Fennell's hands. When he approached Trooper Stephenson, Mr. Lovings observed blood on Trooper Stephenson's forehead.
20. On 30 August 1993, Mr. Joe Don Boles, Sr., was a third citizen who witnessed the events at the scene in question. On that date, Mr. Boles was driving south on I-85, opposite the scene. Mr. Boles initially noticed the blue flashing lights of the patrol car on the north bound side and then saw Trooper Stephenson and Mr. Fennell. Mr. Boles observed Trooper Stephenson crouched down with his hands around Mr. Fennell's waistline, who had his hands raised in the air. Mr. Boles testified that he "thought he (Trooper Stephenson) was getting beat to death." Mr. Boles did not see a gun, but did observe a black object in one of their hands. Because of what he had observed, Mr. Boles stopped and made a u-turn in order to assist the trooper. After making his turn, Mr. Boles parked his car just behind the trooper's patrol car. He then observed Trooper Stephenson walking back to his car with his service revolver hanging down beside him. Additionally, Mr. Boles noticed blood on Trooper Stephenson's forehead and offered first aid, which Trooper Stephenson declined.
21. Trooper Stephenson contacted his communications center and informed them that he had been involved in a shooting and that he needed assistance. Trooper Stephenson then returned to Mr. Fennell's body and checked for a pulse. Finding no pulse, Trooper Stephenson returned to his squad car and called for an ambulance.
22. Subsequently, other law enforcement officers and investigators arrived at the scene. Upon taking an inventory of the area, officers found the following items: a black bag, a convoy, nail clippers, an AA battery, pepper mace, a set of small scales, a plastic bag with an off-white substance later identified as crack cocaine, two prophylactics, a nylon bag with a mirror and calculator inside, a clear plastic bag containing $1,200.00, shell casings, a set of keys assorted coins, and a KBI, Inc., pistol.
23. The KBI pistol and scales were sent to the laboratory for fingerprint testing. The tests revealed no usable prints for identification purposes on either the pistol or scales.
24. Mr. Fennell's body was sent to the Office of the Chief Medical Examiner. The autopsy report revealed that Mr. Fennell sustained five gunshots wounds, along with an abrasion on the posterior surface of the right arm and a small abrasion with a tread pattern over the left anterior hip. The medical examiner was unable to determine the order of the gunshot wounds. However, two of the wounds were caused by a single shot, which explains the difference between the number of shots fired (4) and the number of gunshot wounds (5).
25. Although inconsistencies exist between Trooper Stephenson's testimony at the hearing before the Deputy Commissioner and the statements Trooper Stephenson gave following the incident, Trooper Stephenson's testimony regarding his actions as they relate to the shooting of Mr. Fennell is uncontradicted and is accepted as credible.
26. When Trooper Stephenson shot Mr. Fennell, he acted intentionally. Trooper Stephenson believed that Mr. Fennell had a gun and that he was in danger of being shot by Mr. Fennell. Trooper Stephenson not only intended to shoot, but intended to inflict deadly force, and did so in fact by causing the death of Mr. Fennell. Therefore, Mr. Fennell's death was the result of an intentional act and cannot be found to have been the result of negligent conduct. Plaintiffs failed to meet their burden of proving that Trooper Stephenson was negligent.
27. On 8 August 1998, defendant filed a motion to dismiss, or in the alternative, for summary judgment on the remaining claim against the Department of Crime Control and Public Safety based upon collateral estoppel. This motion was filed following a ruling by the Fourth Circuit Court of Appeals that upheld a lower court's dismissal of all plaintiffs' federal claims. At the time defendant filed its motion with the Commission, plaintiffs had filed a Motion to Reconsider with the Fourth Circuit. Accordingly, the judgment upon which defendant based its claim of collateral estoppel was not final at the time its motion was filed. The Full Commission finds that the Deputy Commissioner's denial of defendant's motion was proper.
 * * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The judgment by the Fourth Circuit Court of Appeals upon which defendant based its motion to dismiss or for summary judgment was not final when defendant's motion was filed before the Deputy Commissioner. Therefore, plaintiffs' claim was not barred by collateral estoppel. See, State ex rel. Tucker v.Frinzi, 344 N.C. 411, 414 S.E.2d 127 (1996).
2. Under the Tort Claims Act, the state has waived sovereign immunity and therefore, plaintiffs' claim is not barred by any doctrine of immunity relating to public officials as raised by defendant. N.C. Gen. Stat. § 143-291 et seq.
3. When Trooper Stephenson shot Mr. Fennell, he not only intended to shoot, but intended to inflict deadly force. Therefore, this case is distinguishable from and is not controlled by the holding in Jackson v. N.C. Dept., CrimeCtrl. Pub. Safety, 97 N.C. App. 425, 388 S.E.2d 770
(1990).
4. The Tort Claims Act provides that the State is liable only for the negligent acts or omissions of its employees. N.C. Gen. Stat. § 143-291 et seq. The death of Mr. Fennell was the result of Trooper Stephenson's intentional actions and cannot be found to be the result of negligent conduct. Therefore, plaintiffs' claim must be denied. N.C. Gen. Stat. § 143-291 et seq.
5 The Industrial Commission does not have jurisdiction over claims arising from intentional acts. N.C. Gen. Stat. §143-291 et seq; Guthrie v. State Ports Authority,307 N.C. 522, 299 S.E.2d 618 (1983). * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the Deputy Commissioner's holding and enters the following:
 O R D E R
Under the law, because the Industrial Commission does not have jurisdiction over claims arising from intentional acts, plaintiffs' claim must be DENIED.
 S/ _____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _____________ THOMAS J. BOLCH COMMISSIONER
Retired Before Decision Written
J. HOWARD BUNN, JR. CHAIRMAN